# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,     )
    )
    v.     )     ID No. 2003010641
    )
CHRISTOPHER IRWIN,     )
    )
    Defendant.     )

Submitted: January 20, 2021
Decided: April 30, 2021

## OPINION

*Upon Defendant's Motion to Terminate Probation*
**GRANTED in part.**

James K. McCloskey, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State*.

Thomas A. Foley, Esquire, Wilmington, Delaware, *Attorney for Defendant*.

**Adams, J.**

Defendant Christopher Irwin ("Irwin") filed this Motion to Terminate Probation after officers with Operation Safe Streets ("Safe Streets Task Force" or "Safe Streets") detained Irwin at his first visit with Probation & Parole ("P&P") and conducted warrantless searches of his house and vehicle. In his Motion, Irwin requests that the Court terminate the remainder of his probation, arguing that the searches of his house and vehicle violated the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution; Article I, §§ 6 and 7 of the Delaware Constitution; and Delaware statutory law.

This opinion presents two issues: (1) whether P&P had reasonable suspicion to conduct the searches, specifically whether P&P substantially complied with Department of Correction, Bureau of Community Corrections, Probation and Parole Procedure 7.19 ("Procedure 7.19"), which permits warrantless searches of a probationer's house; and (2) if P&P violated Irwin's rights by the search, but seized no evidence, what remedy is appropriate. The second issue presents a matter of first impression in this Court. For the reasons set forth below, Irwin's Motion to Terminate Probation is GRANTED, in part.

## I. **Factual Background**[1]

### A. *Operation Safe Streets*

Safe Streets is a statewide crime reduction initiative that partners P&P officers with police officers "to identify, monitor, and investigate high risk and/or repeat offenders" who have demonstrated a history of criminal behavior. Safe Streets officers do not supervise probationer caseloads and are not re-entry coordinators.

The New Castle County Police Department ("NCCPD") is one of the police departments that partners with Safe Streets. Safe Streets officers accompany NCCPD officers on drug and gun investigations and vehicle stops. Safe Streets officers also engage in proactive patrols, conduct home visits, administrative searches, office visits, and investigate individuals who are not on probation.

### B. *Christopher Irwin's Arrest*

In March of 2020, NCCPD and Safe Streets conducted a non-probation investigation into suspected drug dealing by a man named Joseph McDaniel ("McDaniel"). During this investigation, NCCPD Detective Donald Witte observed interactions indicative of drug dealing between McDaniel and Irwin on Laura Lee

---

[1] The Court's findings of fact are based on Irwin's Motion and a separate request for documents from the State, the State's responses to the Motion and document request, evidence presented at the hearing on January 14, 2021, and oral argument on January 20, 2021.

Court in Bear, Delaware. As a result of this investigation, NCCPD took McDaniel into custody.

Shortly after McDaniel's arrest, NCCPD stopped Irwin's vehicle. During this stop, Irwin admitted he had methamphetamine and marijuana in his vehicle. He further admitted that he went to McDaniel's residence to sell the methamphetamine and that he had additional drugs and firearms at his residence. Irwin then consented to a search of his house. During the search of Irwin's house, NCCPD seized 101.2 grams of marijuana, 6.3 grams of methamphetamine, digital scales, firearms, firearm rounds, and $1,450.00 cash. NCCPD subsequently arrested Irwin because of the search.

On October 7, 2020, Irwin pleaded guilty to Drug Dealing – Tier 2 Methamphetamine, Possession of a Firearm by a Person Prohibited, and Conspiracy Second Degree. The Court sentenced Irwin to a total of fifteen years at Level V, suspended for eighteen months at Level III probation. Following Irwin's initial intake at the courthouse, P&P directed him to report to the Hares Corner Probation and Parole Office ("Hares Corner") by Tuesday, October 13, 2020, where he was assigned to Probation Officer ("P.O.") Joseph Manno.

C. *NCCPD Receives a Tip About Defendant's Purported Sales of Methamphetamine*

On October 11, 2020, Detective Witte provided information to P.O. William Walker[2] from a past proven reliable confidential informant ("CI").[3] P.O. Walker testified that the CI told Detective Witte that Irwin was selling drugs out of his house and that Irwin possessed a "large bag" of drugs.[4] P.O. Walker also testified that the CI told Detective Witte that Irwin was not concerned about his urinalysis at

---

[2] P.O. Walker is not Irwin's probation officer; rather, he is a probation officer assigned to Safe Streets, where he has served for eleven years. Detective Witte testified that P.O. Walker works with him "every day," that P.O. Walker's hours overlap with his hours, and that he knows P.O. Walker does not have his own caseload because "he definitely works with us."

[3] Detective Witte testified that in August or September of 2020—after Irwin's arrest, but prior to his guilty plea—he received information from a confidential informant that an individual named John Lewis ("Lewis") was supplying Irwin with methamphetamine. Safe Streets officers conducted surveillance on Irwin's house, but the tip did not lead to the recovery of contraband from Irwin. This information is not corroborated by the written record (*i.e.*, the October 14 Arrest-Incident Report filled out by P.O. Walker) and the Court does not find this testimony to be credible or supported by the evidence presented. Therefore, such information could not have formed the basis of the administrative search and the Court will not consider it in its analysis.

[4] Detective Witte testified that the CI told him that Irwin possessed a "large bag" of marijuana. P.O. Walker testified more generally that the CI told him that Irwin also possessed a "large bag" of drugs. None of this testimony is corroborated by the written record (*i.e.*, the October 14 Arrest-Incident Report filled out by P.O. Walker) and the Court does not find this testimony to be credible or supported by the evidence presented. Therefore, such information could not have formed the basis of the administrative search.

probation, even though he was actively smoking marijuana, because Irwin knew "the first urine screens were free."[5]

During this conversation about the CI, Detective Witte and P.O. Walker learned that Irwin would be reporting to P&P on October 13. At this point, Detective Witte and P.O. Walker came up with a plan: if Irwin tested positive for marijuana at his initial visit to P&P, they would perform an administrative search of his house. Therefore, Detective Witte requested that P.O. Walker ask a supervisor for approval to obtain a urine screen as soon as Irwin reported to probation to "corroborate the information that there was marijuana usage" to form the basis for an administrative search.

On October 13, 2020, Irwin reported to probation at the Hares Corner office. Immediately after reporting, P.O. Jacob Selba, the officer on duty,[6] instructed Irwin

---

[5] This testimony, however, is inconsistent with Detective Witte's testimony about Irwin's use of marijuana. Detective Witte never testified that the CI told Witte that Irwin was not concerned about using marijuana; rather, Detective Witte testified that the CI told Witte that Irwin "expected that probation would go out to his residence and search" because of the marijuana use. Therefore, the Court finds that Detective Witte only told P.O. Walker that the CI told Detective Witte that Irwin was actively smoking marijuana, and nothing more. The Court also does not find it credible that Irwin, who had one misdemeanor on his record prior to this felony conviction, would know that he would be tested at his first visit to P&P. The fact that P.O. Walker had to specifically ask for the urine screen is evidence that Irwin may not have automatically been tested at his first visit to P&P.

[6] P.O. Selba is not Irwin's probation officer. P.O. Selba covered for P.O. Manno, Irwin's assigned probation officer, who was out of the office on the day in question.

6

to provide a urine sample. The urine sample tested positive for marijuana, and P.O. Selba told Irwin to flush the sample down the toilet rather than submitting it to a lab.[7] Another probation officer immediately handcuffed Irwin, placed him in a holding cell, and took his keys, cell phone, and wallet.[8]

Within minutes of Irwin's positive urine screen for marijuana,[9] P.O. Selba informed P.O. Walker, who then called Detective Witte to inform Witte of the positive urine screen. Detective Witte, who was not on duty that day, arrived at Hares Corner within twenty-five minutes where he met with P.O. Michael McHugh, another probation officer assigned to Safe Streets. Detective Witte went to Irwin's holding cell where he confronted Irwin about using drugs on probation and asked if there were any weapons at Irwin's house. Irwin disputed any drug use while on probation and denied having weapons in his house. Detective Witte then retrieved Irwin's keys and left, leaving Irwin handcuffed inside the holding cell.

---

[7] P.O. Selba testified that discarding the urine sample is a new procedure for P&P as of June 2020, but the State provided no evidence suggesting that it is in fact a new procedure.

[8] P.O. Selba immediately entered the information about Irwin's positive urine screen into the Delaware Automated Correctional System ("DACS"). DACS is a real-time system used by P&P to input information about a specific probationer.

[9] The urine screen was negative for all other drugs tested, including for methamphetamine.

P.O. Walker testified that sometime after Irwin's positive urine screen, he called his supervisor, Carlo Pini ("Officer Pini"), to obtain approval for the search of Irwin's house. According to P.O. Walker, during the one-to-three-minute phone call, he discussed the Arrest-Search Checklist as required by Procedure Number 7.19 with Officer Pini. After this brief conversation, Officer Pini purportedly gave verbal consent for the search of Irwin's house. There is no real-time evidence of this phone call occurring, such as a text message, phone record, or DACS entry.[10]

D.      *The Searches of Irwin's House and Vehicle*

After leaving Irwin's cell, P.O. McHugh used Irwin's keys to open his vehicle and search it. Officer Pini testified that he could not remember if he approved the search of Irwin's vehicle, but did not believe he did. There is no evidence that P.O. Walker or any other member of Safe Streets sought approval to search Irwin's vehicle or that Officer Pini approved the search. P.O. McHugh did not find evidence of any crime in Irwin's vehicle.

---

[10]      Prior to the hearing, Irwin requested that the State produce cell phone records for P.O. Walker, Officer Pini, and Detective Witte for October 13 and Irwin's DACS records. The State refused, and Irwin filed a motion with the Court requesting the records. (D.I. 12). During a pre-hearing teleconference, the Court held that the DACS information was relevant to the hearing and ordered it to be produced. The Court denied the request with respect to the cell phone records because the relevant officers were all scheduled to testify at the hearing. Despite this ruling, nothing prevented the State from providing the phone records, even on a more limited basis, to Irwin for the purposes of the hearing.

8

P.O. Walker and P.O. McHugh and NCCPD Detectives Witte and Kenneth Guarino then went to Irwin's house. After arriving, the officers used Irwin's house key to open his back door. The State produced a three-minute-long video of the beginning of the search from Detective Witte's body camera, where it shows the four officers "clearing"[11] Irwin's house and commenting on items therein, such as BB guns and bullets in Irwin's basement. After three minutes, Detective Witte turned his body camera off.[12] Detective Witte testified that he did this because NCCPD is only there to assist with clearing the house, but not the search of the house.

P.O. Walker testified that only Safe Streets probation officers conducted the search of the house without the assistance of NCCPD, but there is no body camera footage from either NCCPD detective or the Safe Streets probation officers to corroborate this testimony. Detective Witte did testify, however, that he stayed inside while the Safe Streets probation officers performed their search. The Safe

---

[11] To clear the house, the body camera shows NCCPD and Safe Streets officers investigating Irwin's house for any person or potential threat.

[12] Detective Witte testified that when he assists P&P with a search, he routinely shuts his camera off after the location is cleared. This is in contrast with a search performed solely by NCCPD, where the officer's body camera would stay on the entire search.

Streets officers did not seize any evidence from the search of Irwin's house, but Irwin testified that $1,200 was missing from his house.[13]

After the search took place—approximately three hours after Irwin was placed in the holding cell—P.O. Walker met with Irwin in his holding cell. Irwin and the State dispute what subsequently transpired. Irwin claims that P.O. Walker told him that Safe Streets found ammunition inside his house and that P.O. Walker asked Irwin if he still wanted a lawyer, and told Irwin, "[H]e should be locking [him] up for it[,] but if [he] didn't say anything to anybody and kept my mouth shut, that he would let me walk out of there tonight." The State claims that P.O. Walker told Irwin that while they found ammunition at his house, which would constitute violation of his probation, he "would not be violated for the ammunition and was given an opportunity to dispose of it himself because he just started probation." Both parties agree that P&P did not file a violation of probation report for Irwin's positive urine screen or for the ammunition found at his house.

---

[13] According to the State, one to two days after the search, "Detective Witte obtained information from the CI that [Irwin] intended to fabricate a story that Safe Street officers stole $1,200 from his residence" and that Irwin "hid money behind a picture frame so that officers would not find it and that [Irwin] removed the marijuana and BB gun from the residence prior to the search." (D.I. 7). Detective Witte testified in similar fashion about this tip during the evidentiary hearing and added that the CI told him that "there would be a motion filed against Safe Streets for the search." This tip is not listed in the DACS system (or in any written evidence presented to the Court).

## II.    Parties' Contentions

Irwin argues that P&P violated his constitutional and statutory rights by the search of his house and vehicle. Because Safe Streets officers did not seize any evidence from Irwin's house nor charge him with a crime, however, there is no evidence to suppress. Nonetheless, Irwin argues that he is entitled to *some* remedy because of these alleged violations. Here, Irwin argues that as a remedy, the Court should terminate the remainder of his eighteen-month probation. The State argues that the October 13 administrative search of Irwin's house and vehicle was lawful and reasonable per Procedure 7.19 and that P&P acted appropriately. The State opposes any request for relief by Irwin.

## III.    Analysis

The State has the burden to prove by a preponderance of the evidence that the search or seizure conducted without a warrant was justified.[14]  To justify an administrative search of a probationer's house and vehicle,[15] the State must demonstrate: (1) that it had reasonable articulable suspicion of criminal activity prior to the search of a house or vehicle; and (2) that P&P substantially complied with the

---

[14]    *State v. Kolaco*, 2020 WL 7334176, at *13 ("*Kolaco I*") (citing *Hunter v. State*, 783 A.2d 558, 560–61 (Del. 2001)).

[15]    Procedure 7.19 applies to searches "of a person's house or other buildings or premises, or of his person, or of his vehicle, etc."  Procedure 7.19 at § V.

11

requirements of Procedure 7.19.[16]  Reasonable suspicion for a warrantless administrative search exists where the totality of the circumstances indicates that the officer had a particularized and objective basis for suspecting legal wrongdoing.[17]

The Court will first address Delaware law about warrantless searches of probationers, specifically whether P&P substantially complied with Procedure 7.19.[18]  The Court will then turn to what remedy, if any, is appropriate.

A.    *Search of a Probationer's House*

Irwin, as a probationer, enjoys fewer protections under the Fourth Amendment than other citizens.[19]  For example, P&P may arrest and search a probationer and his or her effects pursuant to an administrative warrant.[20]  There is, however, no actual warrant involved and no review by a neutral magistrate prior to the search. Instead, "in the probation context, an administrative procedure,

---

[16]    *Kolaco I* at *13; *Pendleton*, 990 A.2d at 419.

[17]    *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008).

[18]    Because the Court resolves Irwin's motion on statutory grounds, it will not address any issues under the United States or Delaware Constitutions as raised by Irwin.  *Culver v. State*, 956 A.2d 5, 7 n.1 (Del. 2008).

[19]    *Walker v. State*, 205 A.3d 823, 826 (Del. 2019) (citing *Donald v. State*, 903 A.2d 315, 318-19 (Del. 2006)).

[20]    *Kolaco I*, at *13.

authorized in a highly regulated environment, permits a search based upon the relaxed standards in light of a probationer's decreased expectation of privacy."[21]

A person's probationary status, however, does not mean that person is without protection from unreasonable searches and seizures.[22] P&P, pursuant to enabling legislation enacted by the Delaware General Assembly, adopted regulations governing the warrantless search of probationers. One such regulation is Procedure 7.19,[23] which addresses arrests and searches of probationers.

Procedure 7.19 requires that the probation officer who seeks to justify a search must use Form #506, an Arrest-Search Checklist.[24] Procedure 7.19 also specifies that the searching officer hold a conference with his or her supervisor before the search.[25] Specifically, pursuant to Procedure 7.19, the officer applying for the search

---

[21] *Id.*

[22] *Sierra v. State*, 958 A.2d at 832; *Pendleton v. State*, 990 A.2d 417, 419 (Del. 2010).

[23] Procedure 7.19 is a written policy from the State of Delaware Department of Correction, Bureau of Community Corrections Probation and Parole. Procedure 7.19's stated purpose is "[t]o provide guidelines and procedures for using the Arrest-Search Checklist [in connection with arresting and searching a probationer] and in making arrests and searches." State of Delaware Department of Correction, Bureau of Community Corrections Probation and Parole Regulations, Section 7, Procedure 7.19 at § II.

[24] Procedure 7.19 at § VII(A).

[25] Procedure 7.19 at § VII(E).

should consider the following factors and discuss them with a supervisor beforehand:

1. The officer has knowledge or sufficient reason to believe the offender possesses contraband;

2. The officer has knowledge or sufficient reason to believe the offender is in violation of probation and parole;

3. There is information from a reliable informant indicating the offender possesses contraband or is violating the law;

4. The information from the informant is corroborated; and

5. Approval for the search has been obtained from a Supervisor, a Manager, or the Director. If the approval is not obtained prior to the search, list the exigent circumstances on the Search Checklist requiring you to proceed with the search.[26]

Procedure 7.19 provides only one exception to its requirements: exigent circumstances.[27] The State does not argue exigent circumstances are present here.

B. *P&P Did Not Have Reasonable Suspicion to Conduct the Searches and P&P Did Not Substantially Comply with Procedure 7.19*

Irwin challenges the searches of his house and vehicle on the following grounds: (1) the CI's tip was not sufficient to give P&P reasonable suspicion to

---

[26] *Id.* The Supreme Court has held that "substantial compliance" with Procedure 7.19 does not require the State to provide a completed and signed paper copy of a document if the officer and supervisor fully discussed these factors. *Pendleton*, 990 A.2d at 420.

[27] *Kolaco I* at *13.

perform the searches, and therefore P&P did not comply with Procedure 7.19; and (2) the State cannot show that Officer Pini and P.O. Walker held the required case conference prior to the searches.

First, Procedure 7.19 requires that P&P consider certain information in its decision-making process prior to a search of a probationer, some of which relate to a tip from an informant.[28] The Court will address two aspects of the CI's tip at issue here, both of which are required by Procedure 7.19 when assessing an informant's tip: (1) whether P&P assessed the credibility, reliability, and basis of knowledge of the CI's tip to support a reasonable suspicion of wrongdoing;[29] and (2) whether P&P corroborated the CI's tip.[30] Second, Procedure 7.19 requires that the probation officer contact his supervisor "prior to any actions being taken."[31] As discussed below, the State has failed to show by a preponderance of the evidence that P&P satisfied these requirements and thus did not comply with Procedure 7.19 nor have reasonable suspicion to conduct the searches of Irwin's house and vehicle.

---

[28]    Procedure 7.19 at §§ VII(A)(6); *see id.* at VII(E).

[29]    *Sierra*, 958 A.2d at 830.

[30]    *Kolaco I* at *15; *see also* Procedure 7.19 at §§ VII(A)(6), VII(E).

[31]    Procedure 7.19 at § VII(A)(1); *see id.* at VII(E).

15

1. **P.O. Walker Did Not Satisfy Procedure 7.19's Requirement to Assess the CI's Tip**

Pursuant to Procedure 7.19, a probation officer must "assess any 'tip' relayed to them and determine independently if reasonable suspicion exists that would, in the ordinary course of their duties, prompt a search of a probationer's dwelling."[32] When assessing a tip, the officers must "consider the detail of the information received from the informant, the consistency of the information, the reliability of the informant in the past, and any reasons why the informant would supply the information."[33]

To determine if an informant's tip is sufficient to create a reasonable suspicion of wrongdoing, the Court will consider the totality of the circumstances.[34] If, however, "probation officers do not engage in an independent analysis of the reliability of facts supporting an 'informants' tip, they would contravene Procedure 7.19 Section VI(F)(3)."[35] The probation officers "thereby essentially become

---

[32] *Culver*, 956 A.2d at 7; *Walker v. State*, 205 A.3d 823, 825 (Del. 2019).

[33] *Walker v. State*, 205 A.3d 823, 825 (Del. 2019) (citing *Culver*, 956 A.2d at 7).

[34] *Sierra*, 958 A.2d at 829.

[35] *Culver*, at 13.

16

surrogates for the police, conveniently used when the police had no lawful authority to act on their own."[36]

Based on the totality of the circumstances, the Court finds that the CI's tip does not create a reasonable suspicion of wrongdoing or, by extension, comply with Procedure 7.19. [37] Here, the only information from the CI that the Court finds Detective Witte communicated to P.O. Walker is the information found in the Arrest-Incident Report dated October 14, 2020: Irwin was selling "street level illicit drugs (methamphetamine[])" out of his house in Middletown and that Irwin was actively smoking marijuana. The CI's tip here suffers from two main deficiencies: the information from the CI was not sufficiently detailed and P&P did not consider the CI's basis of knowledge for the tip.

The tip lacks detail because there is no evidence that Detective Witte provided Walker sufficient facts so that Walker could independently and objectively assess

---

[36] *Id.*

[37] The Court is mindful that the Delaware Supreme Court has held that "reasonable suspicion should be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable officer with the same knowledge and experience" as the officers involved. *State v. Brady*, 152 A.3d 140, at *2 (Del. 2016) (TABLE). The Court, however, has already determined that the testimony about any prior "tips" Detective Witte received were either not credible or not communicated to P.O. Walker because they were not included in the Arrest-Incident Report, and therefore could not have served as a basis for the searches.

the reasonableness of the tip.[38]  The portion of the tip about Irwin's sale of

methamphetamine lacked key details such as the amount of methamphetamine

involved, where in the house Irwin stored the methamphetamine, to whom or where

Irwin planned to distribute the methamphetamine, or other details to establish that

the CI had personal knowledge of Irwin's activity.[39]  The portion of the tip about

Irwin's alleged use of marijuana lacked key details such as when and where Irwin

smoked marijuana, from whom, or if, he purchased it, or if Irwin still possessed it,

where it was being stored.[40]  The tip also lacked critical information pertaining to

---

[38]  *See State v. Walker*, Crim. ID. No. 1706003315, Suppression Decision Hrg. Tr. at 5 (confidential informant's tip did not include sufficient detail because "[n]othing was indicated about the amount of heroin involved; where in the bedroom it was allegedly being stored; to whom or where the defendant planned to distribute it; or other details to establish, in the words of the *Culver* decision, that the informant had 'personal knowledge of the defendant's activity.'").  *See also LeGrande v. State*, 947 A.2d 1103, 1111 (Del. 2008) (where the police only corroborated the accused's identity, the location of his locked apartment, his probationary status, and that his neighbor was wanted did not show that the informant had knowledge of concealed criminal activity).  As discussed below, the tip is also not consistent with the investigation that attempted to corroborate it – namely, the positive urine screen.

[39]  *Compare Shepeard v. State*, 133 A.3d 204, 2016 WL 690544, at *3 (Del. Feb. 18, 2016) (confidential informant's tip was sufficiently detailed and consistent because the informant knew where Shepeard lived, had been inside the house and described its internal layout (including the location of Shepeard's bedroom, where he saw a rifle under the bed) that Shepeard was actively selling crack cocaine, and positively identified Shepeard by his street name "Che Ball" and photograph).

[40]  *See id.*

18

when Irwin was scheduled to report to P&P.[41]  Detective Witte testified that he was unaware that Irwin was to report to P&P on October 13 until he spoke with P.O. Walker, indicating that the CI did not provide or have knowledge of when Irwin was to report to P&P.[42]

The record about the CI's basis of knowledge—the CI's credibility, reliability, and reasons for providing the information—is limited and contradictory.  During the evidentiary hearing, P.O. Walker did not testify about whether he inquired into the CI's reliability, but instead focused on Detective Witte's reliability.  There is no evidence in the record reflecting that either Detective Witte or P.O. Walker considered the reason why the CI supplied the information.  As such, the Court must assume that the CI had something to gain by providing the tip.[43]  In light of the

---

[41]  In considering the reliability of an informant's tip to determine the lawfulness of the search, the Supreme Court has held that "the accurate prediction of future movements adequately corroborates a tip even from an anonymous informant." *State v. Holden*, 60 A.3d 1110, 1116 (Del. 2013) (citation omitted).

[42]  As P.O. Walker testified, on October 11, the day that Detective Witte relayed the CI's tip regarding Irwin's sales of methamphetamine and Irwin's marijuana use, P.O. Walker and Detective Witte came up with a "plan": they were going to use the predicted positive urine screen to serve as a basis for an administrative search.  This supports their belief that the tip alone would not be enough to comply with Procedure 7.19.

[43]  *See Sierra*, 958 A.2d at 832 (holding that because the officer at issue was unaware of the informant's motives, the informant had something to gain by providing the tip).

totality of the circumstances, the Court finds that the CI's tip did not create a reasonable suspicion of wrongdoing.

> 2. P.O. Walker Did Not Satisfy Procedure 7.19 Because He Did Not Corroborate the CI's Tip

Procedure 7.19 is clear in its requirement that P&P must corroborate a CI's tip prior to a search.[44] The only "corroboration," if any, for the CI's tip is Irwin's positive marijuana screen on his first visit to probation. Detective Witte and P.O. Walker admitted on cross examination that the positive urine screen served as the corroboration for only the marijuana usage, not the methamphetamine sales.[45] A positive marijuana screen on the first day of probation can hardly serve as corroboration that Irwin was selling methamphetamine out of his house.

The positive urine screen also does little to corroborate Irwin's use of marijuana at the time he reported to probation and certainly cannot establish reasonable suspicion to search Irwin's house or vehicle.[46] At most, the positive

---

[44] Procedure 7.19 at § VII(E)(4).

[45] P.O. Walker could have, but did not, conduct surveillance or perform a curfew check to corroborate Irwin's alleged sale of methamphetamine.

[46] *See*, *e.g.*, *State v. Fax*, 2017 WL 2418275, at *3 (Del. Super. June 2, 2017) (holding that a fifteen-day-old failed drug screen was insufficient to establish reasonable suspicion to search defendant's house, especially because defendant's P.O. did not file a violation of probation report for the failed drug tests). While the failed drug screen in *Fax* was fifteen days old, the reasoning in *Fax* is instructive here because P&P decided not to violate Irwin's probation for the failed drug screen prior to the search.

20

urine screen indicates that Irwin smoked marijuana at *some point* in the past. As P.O. Walker admitted, because no lab test was performed, it is possible Irwin could have smoked marijuana before he even took his plea on October 7, 2020. P.O. Walker also testified that he decided that he was only going to give Irwin a verbal warning—and not violate his probation—prior to when the Arrest-Search Checklist was completed.[47] Therefore, the Court finds that the tip about Irwin's sale of methamphetamine and Irwin smoking marijuana was not corroborated as required by Procedure 7.19.

> 3. The State Has Not Shown by a Preponderance of the Evidence that Officer Pini and P.O. Walker held a Case Conference Prior to the Searches

The requirement for a probation officer to receive approval from his or her supervisor prior to an administrative search is an indispensable requirement of Procedure 7.19. When a procedure necessary to authorize an administrative search specifically requires supervisor approval, and the State does not present evidence

---

[47] The decision to not file a violation of probation report for Irwin testing positive for marijuana on his first visit to P&P is consistent with typical P&P procedure. According to testimony from Jeffrey Boykin, the head of Hares Corner P&P, unless there is a "zero tolerance sentence," officers have discretion as to whether to file a violation of probation after a positive drug screen on their first visit, and oftentimes rather than violating, an administrative sanction (or warning) is given. *Compare Pendleton v. State*, 990 A.2d 417, 420 (Del. 2010) (holding that four positive urine screens indicated that the defendant violated his probation on four prior occasions).

that the probation officer has completed this requirement, the State has not demonstrated substantial compliance with the procedure.[48]  As this Court has recently held:

> Because no neutral magistrate reviews P&P's application for an administrative search, a multi-layered approval of a planned search is indispensable under Procedure 7.19.  Absent credible evidence that a director, manager, or supervisor approved the search, there cannot be substantial compliance with Procedure 7.19 unless exigent circumstances justified the search.[49]

The State bears the burden of showing compliance with their own procedure, and "the Court is not free to find supervisor approval absent any evidence supporting that fact."[50]  The procedure for obtaining the approval to conduct an administrative search is not difficult to follow and the documentation that must accompany it is not difficult to prepare.[51]  Despite the minimal requirements of Procedure 7.19, the State cannot show by a preponderance of the evidence that P&P obtained supervisor approval prior to searching Irwin's house or vehicle.

The written evidence submitted by the State does not support a finding that P&P obtained supervisory approval prior to the searches.  Irwin's DACS records,

---

[48]     *Kolaco 1*, at *15.

[49]     *Id.* at *16.

[50]     *Id.*

[51]     *Id.*

which are created in real time, have no entry from October 13 other than Irwin's positive urine screen.[52] According to Officer Pini, a DACS entry is created when the checklist is completed, but no such entry exists here.[53] While the Arrest-Search Report indicates that Officer Pini granted permission to execute an administrative search, the report is dated October 14, 2020 – the day after the search.

The testimonial evidence from Officer Pini and P.O. Walker about the alleged conference on October 13 is contradictory and not credible. For example, Officer Pini and P.O. Walker provided conflicting testimony about their purported discussion of the CI's tip. Officer Pini testified that P.O. Walker told Pini that Walker had spoken with the informant to corroborate the tip. This is contradicted by the testimony of P.O. Walker, who stated that the only corroboration of the CI's tip was Irwin's positive urine screen and Irwin's signed acknowledgement of a the same. Given the deficiencies in the documentary evidence discussed herein and the conflicting testimony, the Court is not satisfied that P.O. Walker received approval from Officer Pini prior to conducting the search of Irwin's house. Therefore, the

---

[52] P.O. Selba entered this information immediately after the positive urine screen at 1:30 p.m. on October 13.

[53] The Court notes that the entry from October 14, 2020 at 13:29 indicates two notifications: (1) that the pre-search report was created and (2) an update that Officer Pini approved the report. Either way, there is no entry directly from P.O. Walker on October 13. The State has admitted no exigent circumstances existed that would prevent P.O. Walker from creating an entry on October 13 prior to the search.

23

State has not met its burden of proof of establishing substantial compliance with Procedure 7.19 and performed an illegal search of Irwin's house and vehicle.

### C. *The Appropriate Remedy for the State's Illegal Search*

During the illegal searches of Irwin's house and vehicle, P&P did not seize any evidence of a crime. As such, there is nothing for the Court to suppress. The Court now turns to what remedy, if any, is afforded to a probationer when they are the subject of an illegal search, but no evidence is seized. This is a matter of first impression before this Court.

Irwin requests that the Court terminate the remainder of his probation because of the illegal search. The State opposes any request for relief. During the post-hearing argument, however, it provided the alternative remedies of a lower level of probation or shortening the probationary period. The Court finds although Irwin has styled his request for relief as a "Motion to Terminate Probation," this motion is more appropriately considered under Superior Court Criminal Rule 35(b).

Pursuant to Criminal Rule 35(b), "[t]he court may suspend the costs or fine, or reduce the fine or term or conditions of partial confinement or probation, at any time."[54] A trial court is given great deference when reviewing a modification of a

---

[54] Del. Super. Ct. Crim. R. 35(b).

sentence, and "the test is whether 'the trial court acted within a zone of reasonableness or stayed within a 'range of choice.'"[55]

Irwin is currently serving a probation-only sentence. Therefore, although the Court sentenced Irwin to Level V time, his sentence was suspended so that he only would serve eighteen months at Level III probation, so long as he complied with the terms of his probation. On November 25, 2020, after P.O. Manno completed his LSI-R[56] assessment of Irwin, P&P lowered Irwin's probation level from Level III to Level II. On December 1, 2020, Irwin completed all financial obligations imposed as part of his sentence. As of the date of this Opinion, Irwin will have served approximately one-third of his probationary sentence. To the Court's knowledge, Irwin has complied with the requirements of probation during this time.

The Court finds that the appropriate remedy for P&P's violation of Procedure 7.19 is to reduce Irwin's sentence of probation to seven months. In other words, once Irwin completes seven months of probation, assuming he receives no new charges and does not violate his probation, he will complete his probation. The

---

[55]     *State v. Fink*, 2020 WL 42046, at *4 (Del. Super. Jan. 3, 2020) (quoting *Wilkerson v. State*, 173 A.3d 1061, 2017 WL 5450747, at *1 (Del. Nov. 13, 2017) (TABLE)).

[56]     LSI-R, or Level of Service Inventory-Revised, is a risk-needs assessment tool utilized by P&P. The assessment determines the defendant's risk of recidivism and the level of need the defendant requires to become rehabilitated.

25

Court finds that such a reduction appropriately balances a remedy for the illegal searches of Irwin's house.[57] The State has tacitly recognized that Irwin's risk to the community is low after his LSI-R assessment and lowered his probation to Level II. Therefore, a reduction of the term of Irwin's probation will both provide Irwin an incentive to continue his probation without issue and a remedy for P&P's violation of Procedure 7.19.

## CONCLUSION

"Delaware law places the responsibility upon probation officers of reintegrating probationers into society by creating treatment plans to alleviate the conditions which brought about the criminal behavior, securing employment, and using all suitable methods to aid and encourage them to bring about improvement in their conduct and conditions and to meet their probation or parole obligations."[58] P&P, instead of attempting to meet this charge, devised a plan to use Irwin's failed

---

[57] *See State v. Robinson*, 209 A.3d 25, 55-58 (Del. 2019) (holding that the remedy must be tailored to the injury suffered). Although *Robinson* discussed the Sixth Amendment, its reasoning is instructive. As noted, the State provided no alternative remedy to Irwin's request to terminate his probation. When asked about this and the implications of *Robinson*, the State still provided no response, insisting instead that Irwin was not entitled to a remedy because P&P did not violate his rights. The Court is mindful of the Supreme Court's directive in *Robinson* to consider alternative remedies when given an "all or nothing" approach and finds that the remedy of reducing Irwin's probation is appropriate under the facts here.

[58] *Pendleton*, 990 A.2d at 421 (internal quotations and citations omitted).

26

urine screen as a basis for an intrusive and illegal search of Irwin's house and vehicle. The "neglect of [P&P's] important responsibilities only denigrates society's trust and confidence in the corrections system."[59]

While the Court does not challenge the practices of Safe Streets, a "probation officer's role is not identical to the role of law enforcement."[60] This is why the two levels of approval for the administrative warrant—one by the probation officer and one by his or her supervisor—are "an indispensable requirement that is necessary to insure that warrantless administrative P&P searches do not proceed based upon a single officer's unfettered discretion."[61]

The State did not meet its burden in this case. It failed to demonstrate that P&P substantially complied with Procedure 7.19 before the search of Irwin's house and vehicle. As a result, the Court grants Irwin's Motion to Terminate Probation in part and will reduce the term of his probation to seven months.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

---

[59]    *Id.*

[60]    *State v. Fax*, 2017 WL 2418275, at *5 (Del. Super. June 2, 2017).

[61]    *State v. Kolaco* ("*Kolaco II*"), 2021 WL 53260, at *3 (Del. Super. Jan. 6, 2021).